**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 30 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SALT LAKE TRIBUNE
PUBLISHING COMPANY, LLC,

      Plaintiff - Appellant,

v.

MANAGEMENT PLANNING, INC.;
MEDIANEWS GROUP, INC.;
KEARNS-TRIBUNE, LLC,

      Defendants - Appellees.

Nos. 03-4256, 03-4259

---

**Appeal from the United States District Court**
**for the District of Utah**
**(Civil Nos. 2:03-CV-565-TS, 2:03-CV-785-TS)**

---

Seth P. Waxman, Wilmer, Cutler & Pickering, LLP, Washington, D.C. (A. Stephen Hut, Jr., Patrick J. Carome, and David S. Cohen, Wilmer, Cutler & Pickering, LLP, Washington, D.C.; Gary F. Bendinger and Lisa R. Petersen, Bendinger, Crockett, Peterson Greenwood & Casey, Salt Lake City, Utah, with him on the briefs) for Plaintiff - Appellant Salt Lake Tribune Publishing Company.

Kevin T. Baine, Williams & Connolly LLP, Washington, D.C. (Paul B. Gaffney and Suzanne H. Woods, Williams & Connolly LLP, Washington, D.C., and James S. Jardine, and Allan T. Brinkerhoff, Ray, Quinney & Nebeker, Salt Lake City, Utah with him on the briefs) for the Defendants - Appellees Medianews Group Inc. and Kearns-Tribune, LLC.

Robert S. Clark, Parr Waddoups Brown Gee & Loveless, Salt Lake City, Utah (Brian J. Ramriell and Bently J. Tolk, Parr Waddoups Brown Gee & Loveless, Salt Lake City, Utah, with him on the briefs for Defendant - Appellee Management Planning, Inc.

---

Before **SEYMOUR** , **HENRY** , and **LUCERO** , Circuit Judges.

---

**LUCERO** , Circuit Judge.

What began as a straightforward transaction has escalated into a frustrating dispute, which the district court attempted to resolve by applying arbitration principles. At issue is whether a certain appraisal constituted an arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. Finding that the appraisal was an arbitration, the district court granted the considerable deference owed to arbitrators' decisions and dismissed Salt Lake Tribune Publishing Company, LLC's ("SLTPC") claims against MediaNews Group, Inc. ("MediaNews") and Management Planning, Inc. ("MPI"). Because we conclude that the appraisal did not constitute an arbitration, we exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **REVERSE**.

**I**

Shareholders of the Kearns-Tribune Corporation, which owned *The Salt Lake Tribune* newspaper, sold their company to Tele-Communications, Inc., which has now become MediaNews. Kearns-Tribune shareholders formed a new company, SLTPC, and, at the time of the sale, acquired an option to purchase the

2

newspaper from MediaNews after five years ("Option Agreement").  Under the

Option Agreement, the exercise price of the option equaled the "Fair Market

Value" of the newspaper's assets.[1]  If the parties could not agree on an exercise

price, each side was to appoint an appraiser ("party appraisers") to assess the

newspaper's Fair Market Value.  If the party appraisers differed from each other

by more than ten percent in their estimation of the newspaper's value, they would

jointly select a third appraiser and the exercise price would equal the average of

the two closest appraisal values reported by the three appraisers.[2]

---

[1] "Fair Market Value," as defined by the Option Agreement, means "the price at which a willing seller would sell, and a willing buyer (having full knowledge of the facts) would buy, the Tribune Assets in any arms' length auction transaction without time constraints and without being under any compulsion to buy or sell."  Additionally, the parties agreed to determine Fair Market Value "on a going concern or liquidation basis, whichever would yield the higher result, as of the last day of the month preceding the month of the Notice Date," which is the month wherein SLTPC provided written notice of its intent to exercise its option.

[2] The Option Agreement provides:
Whenever any determination of the Exercise Price is required to be made pursuant to this Agreement, [MediaNews] and [SLTPC] shall endeavor in good faith to agree on such determination.  If they are unable to agree within 10 days after the Notice Date, each of [MediaNews] and [SLTPC] shall appoint an [Appraiser]. . . . If the higher of the two Appraised Values is not greater than 110% of the lower Appraised Value, then the Fair Market Value of the Tribune Assets shall be equal to the average of the two Appraised Values; however if the higher Appraised Value is greater than 110% of the lower appraised value, then two such Appraisers shall jointly select a third Appraiser . . . and in such case the Fair Market Value of

(continued...)

3

In August 2002, SLTPC began negotiations with MediaNews to establish the exercise price. Unable to agree on a price, the parties each retained appraisers. MediaNews's appraiser issued a report appraising the Fair Market Value of the newspaper's assets at $380 million, which exceeded SLTPC's appraiser's evaluation of $218 million. Because the party appraisers differed by more than ten percent, they turned to the selection of a third appraiser. Following protracted negotiations, in which each side rejected the other's preferred candidates, the parties ultimately selected MPI. In a letter to the party appraisers, MPI agreed to appraise the Fair Market Value of the newspaper's assets and specified the method by which it would conduct the appraisal. MediaNews and SLTPC responded with a letter agreeing to retain MPI's services. In combination, MPI's letter to the party appraisers and SLTPC and MediaNews's response constitute the Appraisal Agreement. Pursuant to the Appraisal Agreement, and after conducting the necessary investigation and receiving comments from both parties, MPI issued its final report valuing the newspaper's assets at $331 million.

---

[2](...continued)
the Tribune Assets shall be equal to the average of the two closest Appraised Values reported by the three appraisers, provided, however, that if the highest and the lowest of such three Appraised Values differ from middle by an equal amount, then the Fair Market Value of the Tribune Assets shall be equal to such middle determination.

Claiming that MPI failed to produce its appraisal under the standards required by the Option Agreement, SLTPC sued MediaNews and MPI in district court seeking, inter alia, (1) a declaration that MPI's appraisal may not be used to calculate the exercise price, (2) a ruling imposing a new appraisal process using all new appraisals, a new valuation date, and a new selection of a third appraiser, (3) compensatory damages from MPI based on its alleged breach of contract, (4) compensatory and punitive damages based on MPI's alleged breach of fiduciary duty, and (5) if MPI's appraisal were deemed an "arbitration award," an order vacating such award. In an order denying, in part, motions to dismiss filed by MediaNews and MPI, the court below concluded that MPI's appraisal constituted an arbitration within the meaning of the FAA, which allowed SLTPC to file a motion to vacate to overturn MPI's "arbitration award." Following that order, SLTPC filed a motion to vacate under the FAA, which the district court denied. At this juncture, the court granted the defendants' motion to dismiss.

In its final order, the court determined that its prior orders concluding that MPI's appraisal was an arbitration, not vacated under the FAA, resolved SLTPC's first, second, and fifth claims in favor of MediaNews. Accordingly, the court dismissed all of SLTPC's claims against MediaNews. In dismissing SLTPC's claims against MPI, the court concluded that MPI acted as an arbitrator and therefore was entitled to immunity from civil liability for all acts performed in its

5

arbitral capacity. SLTPC appealed.

## II

We review a district court's dismissal under Fed. R. Civ. P. 12(b)(6) de novo, accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the plaintiff. See Dubbs v. Head Start, Inc., 336 F.3d 1194, 1201 (10th Cir. 2003).

## A

We begin by analyzing whether MPI's appraisal constituted an arbitration within the meaning of the FAA. Because Congress did not define "arbitration" in the FAA, we must first decide which source of law provides that definition. Relying on the Option Agreement's choice-of-law provision electing Delaware law, the district court turned to Delaware law to define "arbitration." On appeal, SLTPC urges us to apply federal law. Our review of the authorities leads us to conclude that SLTPC's position is correct and that federal law supplies the standard by which we must determine whether MPI's appraisal was an arbitration.

In the absence of clear evidence that Congress intended state law to define "arbitration," we must assume that federal law provides the definition. The meaning that the law attaches to the term "arbitration" establishes the scope and force of the FAA. Unless Congress plainly intended the various states' laws to define "arbitration," and to therefore regulate the FAA's application within their

borders, we will look to federal law for the definition. See Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 43 (1989) ("We start . . . with the general assumption that in the absence of a plain indication to the contrary, Congress when it enacts a statute is not making the application of the federal act dependent on state law.") (internal citations omitted). Because federal law applies nationally, we assume that Congress desires national uniformity in the application of its laws. See, e.g., Jerome v. United States, 318 U.S. 101, 104 (1943). Those cases where Congress intended state law to define a statutory term have usually been those where Congress clearly did not intend uniformity. See Holyfield, 490 U.S. at 43-44.

Neither the language nor the legislative history of the FAA demonstrate that Congress plainly intended state law to define the FAA's central term. Not only does the FAA lack a plain indication that state law should govern, it is silent as to what law defines "arbitration." We cannot, on the basis of congressional muteness, conclude that state law should define the FAA's pivotal word.

Were we to hold that state law guides our determination, we would empower states to define arbitration as they choose, thus limiting the FAA's utility. This we decline to do. Congress passed the FAA to ensure that state law would not undermine arbitration agreements. Southland Corp. v. Keating, 465 U.S. 1, 16 (1984) ("Congress intended to foreclose state legislative attempts to

7

undercut the enforceability of arbitration agreements."). In passing the FAA to curb state attempts to eliminate arbitration provisions, Congress likely did not delegate to the states the power to define arbitration in a way that would circumscribe its availability. "It should not be necessary, but it definitely is, to stress that whether a given dispute resolution procedure is arbitration within the meaning of the FAA is a question of federal, not state, law." I Ian R. MacNeil, et. al., Federal Arbitration Law § 2.1.2A (1999 Supp.).

In concluding that state law should define "arbitration," the district court relied on decisions by the Ninth and Fifth Circuits. In Wasyl, Inc. v. First Boston Corp., 813 F.2d 1579, 1582 (9th Cir. 1987), the Ninth Circuit defined arbitration by reference to California law. Although a subsequent panel faced with a similar question felt constrained to follow Wasyl, all three judges concurred specially to "question the vitality of Wasyl . . . ." Portland General Electric Co. v. United States Bank Trust Nat'l Assoc., 218 F.3d 1085, 1091 (9th Cir. 2000) (McKeown, J., concurring). The judges declared it inappropriate to "look to state law to define a term in a federal statute on a subject as to which Congress has declared the need for national uniformity," and that the case before it illustrated that Wasyl created "a patchwork in which the FAA will mean one thing in one state and something else in another." Id. (Tashima and Lay, J.J., concurring). In Hartford Lloyd's Insurance Co. v. Teachworth, 898 F.2d 1058 (5th Cir. 1990), which

8

explicitly followed the reasoning in <u>Wasyl</u>, the Fifth Circuit defined "arbitration" by reference to both Texas law and the law of other states. Although this approach is preferable to looking to only one state's law, we nonetheless conclude that applying federal law is the only way to ensure national uniformity.

Congress did not plainly intend arbitration to mean different things in different states. Rather, it sought a uniform federal policy favoring agreements to arbitrate. Accordingly, we will apply federal law standards to determine whether MPI's appraisal constituted arbitration.

**B**

Under federal law, we must determine if the process at issue sufficiently resembles classic arbitration to fall within the purview of the FAA. <u>See, e.g.</u>, <u>Fit Tech, Inc. v. Bally Total Fitness Holding Corp.</u>, 374 F.3d 1, 14 (1st Cir. 2004) ("the question is how closely the specified procedure resembles classic arbitration"). Central to any conception of classic arbitration is that the disputants empowered a third party to render a decision settling their dispute. <u>See Harrison v. Nisson Motor Corp.</u>, 111 F.3d 343, 350 (3d Cir. 1997) ("the essence of arbitration" is that parties "agreed to arbitrate [their] disputes through to completion, i.e. to an award made by a third-party arbitrator."). Under this test, MPI's appraisal did not constitute an arbitration.

SLTPC and MediaNews fashioned an agreement where, in the event that

9

they could not agree on a price and their chosen appraisers were too far apart, a third appraiser would contribute a value that may, or may not, be used to calculate the exercise price. Parties need not establish quasi-judicial proceedings resolving their disputes to gain the protections of the FAA, but may choose from a broad range of procedures and tailor arbitration to suit their peculiar circumstances. However, one feature that must necessarily appertain to a process to render it an arbitration is that the third party's decision will settle the dispute. See, e.g., MacNeil § 2.3.1.1 (Process is arbitration under the FAA where "the decision of the dispute resolver shall be both final and binding, subject only to the limited judicial review spelled out in the FAA.").[3]

Furthermore, the language employed by the parties in their contract has little probative weight. If the contract states that the third party's decision is final

---

[3] MediaNews relies heavily on AMF, Inc. v. Brunswick Corp., 621 F. Supp. 456 (S.D.N.Y. 1985) and the Second Circuit's McDonnell Douglas decision to argue that MPI's appraisal constituted an arbitration. Both cases acknowledged that arbitration involves a third party rendering a decision that settles the dispute between the parties. See McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 830 (2d Cir. 1988) (Arbitration because "the language clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution.") (emphasis added); AMF, 621 F.Supp. at 460 ("If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration."). Judge Weinstein in AMF found that the process at issue constituted arbitration because "the dispute will be settled by this arbitration." AMF, 621 F. Supp. at 461. Because MPI's appraisal would not necessarily settle the parties' dispute, these cases do not alter our analysis.

and binding, courts must nonetheless scrutinize the process created by the parties to ascertain whether the third party's decision does in fact resolve the dispute. We agree with the Second Circuit that "what is important is [whether] the parties clearly intended to submit some disputes to their chosen instrument for the definitive settlement of grievances under the Agreement." McDonnell Douglas, 858 F.2d at 830 (internal quotation omitted) (emphasis added).

Here, MPI's appraisal would by no means definitively settle the dispute between SLTPC and MediaNews. At most, MPI supplied a data point that the parties could use in establishing the exercise price. Under the terms of the Option Agreement, a scenario existed where the parties would not use MPI's report at all. If the party appraisers reported Fair Market Values that constituted the two closest values, MPI's value would not contribute to the exercise price. Thus, if SLTPC's appraiser valued the newspaper at $200 million and MediaNews's appraiser assigned a $230 million price tag, the parties would turn to a third appraiser because the higher value is greater than 110% of the lower value. If that third appraiser returned with a $270 million figure, the exercise price would equal the average of SLTPC and MediaNews's appraised values and would totally disregard the third evaluation. In such a circumstance the third appraiser's report would hardly settle the parties' dispute, yet under the process established by SLTPC and MediaNews the hypothetical situation is no less likely than the one

11

giving rise to this case.

MPI was not asked to decide between two values established by SLTPC and MediaNews, nor were they asked to assign independently a single value binding on the parties. Indeed the parties did not even agree to average MPI's figure with one or both of their own. The parties merely asked MPI to prepare a report evaluating the newspaper and establishing the Fair Market Value of the newspaper's assets, a value which the parties may, under certain circumstances, have used to fix the exercise price under the Option Agreement. MPI's report would not necessarily settle a dispute between SLTPC and MediaNews.

Perhaps recognizing that MPI's appraisal, standing alone, does not constitute an arbitration, MediaNews stated at oral argument that the entire process, including the party appraisals, was an arbitration. MediaNews suggests that the appraisers respectively hand-picked by the two parties, whose qualifications, abilities, and methods have been thoroughly impugned by the opposing party in the briefs, were somehow co-equal arbitrators with MPI. First, the court below dismissed SLTPC's claims based on its conclusion that MPI's appraisal constituted an arbitration. Nowhere did the district court suggest that the entire process constituted an arbitration. See Salt Lake Tribune Publishing Company, LLC v. Management Planning, Inc., No. 2:03-CV-565 TS, slip op. at 7, 12 (D. Utah Sept. 18, 2003) ("Defendants contend that the Third Appraisal is an

12

arbitration . . . .") ("the court finds that, under Delaware law, the Third Appraisal is an arbitration."). Second, to the extent there existed a dispute requiring arbitration, the party appraisers produced the dispute by affixing values more than ten percent apart. The appraisers selected by the individual parties functioned more like dueling experts than arbitrators. Also belying the suggestion that the process constituted arbitration is the express language of the Appraisal Agreement that provides in the event the Option Agreement "preclude[s] an appraisal in accordance with . . . industry standards and principles, . . . the parties agree to then seek guidance from the Court to resolve that conflict." This hardly sounds like arbitration to us. Because the three-appraisal process does not resemble classic arbitration, we reject MediaNews's suggestion that the entire process constituted an arbitration.

Although our conclusion that the parties did not structure a process sufficiently resembling classic arbitration resolves the question before us, we also note that the parties did not intend to submit their dispute to arbitration. See, e.g., Oil, Chemical & Atomic Workers Int'l Union v. American Oil Co., 528 F.2d 252, 254 (10th Cir. 1976) ("The issue of arbitrability is for judicial determination because no party has to arbitrate a dispute unless it has consented thereto."). Because we are reviewing the district court's dismissal of SLTPC's complaint pursuant to Rule 12(b)(6), we must accept the well-pleaded allegations in the

13

complaint as true and view them in the light most favorable to SLTPC. See Fuller

v. Norton, 86 F.3d 1016, 1020 (10th Cir. 1996). The complaint reveals that the

parties did not consent to, or intend to establish, an arbitration process.

We accept as true that at no time during the negotiation of the Option

Agreement did the parties discuss utilizing the Third Appraisal in an arbitral

manner. Our review of the pleadings, which include, by incorporation, the Option

Agreement and Appraisal Agreement, confirms that at the time of contracting the

parties did not understand that the Third Appraisal would be subject to the FAA

and its limitations on judicial review. Furthermore, at no point during

negotiations with MPI did any party suggest that MPI would function as an

arbitrator or that its appraisal would be considered an arbitral award. Neither at

the time of negotiating the Option Agreement nor during discussions with MPI

did the parties intend to contractually bind themselves to arbitration.

When SLTPC and MediaNews negotiated the Option Agreement they did

not intend to submit a dispute over the exercise price to arbitration governed by

the FAA. Rather they crafted a flexible process maximizing the likelihood that

their respective values would contribute to the exercise price and permitting a

single scenario under which only one of their appraised values would factor into

the price. Simply because MPI assigned a value to the newspaper's assets that

was closer to one of the parties' evaluations than the parties were to each other

14

does not render MPI's report an arbitrator's decision deserving immunity. Accordingly, we reverse the district court's order dismissing SLTPC's claims.[4]

Because the court below erred in resolving this dispute on the basis of arbitral immunity, the court failed to resolve SLTPC's claims at the 12(b)(6) stage. This leaves us no alternative but reluctantly to remand for further proceedings. In doing so, we <u>do not</u> intend this decision to express any opinion as to the underlying merits of the parties' claims. We merely hold that MPI's appraisal did not constitute an arbitration within the meaning of the FAA.

### C

Having concluded that MPI is not entitled to arbitral immunity, we must answer the question of which state's law the district court should employ to adjudicate SLTPC's claims. MediaNews argues that because MPI's authority to perform its appraisal derived from the process specified in the Option Agreement, the Appraisal Agreement implicitly incorporated the Option Agreement's choice-of-law provision selecting Delaware law.[5] We therefore turn to the question of whether the Appraisal Agreement incorporated the Option Agreement's choice-of-

---

[4] Because we hold that MPI's appraisal did not constitute an arbitration, we need not discuss the merits of SLTPC's fifth claim for relief, requesting an order vacating MPI's "award" in the event that the appraisal was an arbitration.

[5] The Option Agreement provides: "This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without reference to rules governing conflicts of law."

15

law clause.[6]

Answering that question leads us through a choice-of-law bramble. Our first step requires us to determine which state's law governs our interpretation of the Appraisal Agreement for the limited purpose of deciding whether the Appraisal Agreement implicitly makes a choice of law. Because this case comes to us from the District of Utah, Utah's law controls our choice-of-law decision at this point. See Shearson Lehman Brothers v. M& L Investments, 10 F.3d 1510, 1514 (10th Cir. 1993) ("In making choice of law determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting. This is true even when choice of law determinations involve the interpretation of contract provisions.") (internal citations omitted).

Utah courts "apply the 'most significant relationship' approach as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to a given circumstance." Waddoups v. Amalgamated Sugar Co., 54 P.3d 1054, 1059 (Utah 2002). In contract disputes, courts consider (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of

_____

[6] Because SLTPC bases its first and second claims on alleged deficiencies in MPI's appraisal, and seeks compensatory and punitive damages from MPI in its third and fourth claims based on MPI's alleged breach of contract and fiduciary duties, we frame our inquiry as whether the Appraisal Agreement incorporated the Option Agreement's choice-of-law provision, and not whether the Option Agreement implicitly extended its choice-of-law clause to disputes arising out of the appraisals specified by the Option Agreement.

16

performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. See Morris v. Health Net of California, Inc., 988 P.2d 940, 942 (Utah 1999); Restatement 2d of Conflict of Laws, § 188; see also Rocky Mountain Helicopters v. Bell Helicopters Textron, 24 F.3d 125, 129 (10th Cir. 1994) (applying Utah's "most significant relationship" test to contract dispute).

These factors lead us to conclude that New Jersey law should govern our interpretation of the Appraisal Agreement for the limited purpose of deciding whether the Appraisal Agreement imported the Option Agreement's choice-of-law clause. With respect to the first factor, the place of contracting, New Jersey, New Mexico, Illinois, Colorado, and Utah all have relationships to the contract. The "contract" at issue consists of two letters: one prepared by MPI in New Jersey and sent by MPI from New Jersey to the party appraisers in Illinois and New Mexico, and a second prepared by MediaNews in Colorado and SLTPC in Utah and sent to MPI in New Jersey. Unfortunately, with regard to the second factor, the record does not reveal where the parties were located when they negotiated all of the terms of the Appraisal Agreement. We do know that on November 22, 2002, SLTPC and MediaNews sought the Utah district court's assistance in ironing out some of the terms of the Appraisal Agreement.

Turning to the third factor, MPI performed most of the contract in New

17

Jersey, which consisted of MPI reviewing financial statements, scrutinizing the appraisals by the party appraisers, examining the newspaper's books, evaluating audit reports, and preparing both a draft and a final appraisal report. As to the fourth factor, the subject matter of this contract is a contract for services, specifically appraisal services. When assessing the subject matter's location in service contracts, Utah courts have looked to both the site where the parties agreed to render services and the recipient's location. See Morris, 988 P.2d at 942 ("The primary subject matter of the contract was the provision of medical services in California to School District employees."). Here, the Appraisal Agreement provides that MPI will perform its appraisal almost exclusively in New Jersey for the benefit of corporations in Utah and Colorado. Finally, the last factor requires us to review the location of the parties. MPI is a Maryland corporation with its principal place of business in New Jersey, SLTPC is a Utah corporation with its principal place of business in Utah, and MediaNews is a Delaware corporation with its principal place of business in Colorado.

It appears that both Utah and New Jersey have strong ties to the contract. Because the alleged breach at issue in this matter occurred in New Jersey, and because New Jersey edges out Utah in our review of the relevant factors, we conclude that New Jersey has the most significant relationship to the Appraisal Agreement.

Under New Jersey law, our interpretation of the Appraisal Agreement primarily depends on the expressed or apparent intent of the parties. See Simonson v. Z Cranbury Associates, 695 A.2d 222, 223 (N.J. 1996). "In interpreting a contract, it is not the real intent but the intent expressed or apparent in the writing that controls." Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 773 A.2d 665, 672 (N.J. 2001) (internal quotation omitted).

Our anfractuous journey therefore ends at the four corners of the Appraisal Agreement, which we examine to ascertain whether the parties intended to incorporate the Option Agreement's choice-of-law provision. To be sure, the Appraisal Agreement explicitly incorporates some, but not all, important elements of the Option Agreement. By its terms, the Appraisal Agreement adopts the Option Agreement's definition of "Tribune Assets" and "Fair Market Value." Additionally, MPI promises to conform its analysis, opinions, and conclusions to "the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation and the Principles of Appraisal Practice and Code of Ethics of the American Society of Appraisers, and the terms of the Option Agreement." If MPI were to determine at any point that the Option Agreement prevents MPI from conducting an appraisal in accordance with the referenced industry standards, the Appraisal Agreement requires it to report this conflict to the parties. Finally, the Appraisal Agreement provides that the party appraisers shall supply MPI with a

19

copy of the Option Agreement.

Which assets MPI appraised and one of the standards by which it evaluated them were provided by the Option Agreement. Finding that the Appraisal Agreement "references, incorporates, is in furtherance of, and performs a task required by and defined in, the Option Agreement," the district court concluded that the state law chosen by the Option Agreement, the law of Delaware, governed MPI's appraisal. Salt Lake Tribune Publishing Company, LLC v. Management Planning, Inc., No. 2:03-CV-565 TS, slip op. at 9-10 (D. Utah Sept. 18, 2003). Although the Appraisal Agreement does reference, further, and perform a task required by the Option Agreement, it does not incorporate the Option Agreement as a whole. Instead, it adopts certain elements of the Option Agreement. We cannot hold MPI's appraisal to Delaware's standards unless all parties explicitly agreed to adopt the Option Agreement's choice-of-law clause. Were this solely a dispute between MediaNews and SLTPC under the Option Agreement, Delaware law would clearly apply by the choice of the parties. However, the agreement at issue involves a third party – a stranger to the first agreement – and this additional party causes us to look solely to the second agreement, the Appraisal Agreement, to answer the choice-of-law question.

MPI and the party appraisers demonstrated their ability to selectively incorporate provisions from the Option Agreement. They imported the Option

20

Agreement's definition of assets and Fair Market Value. Rather than agreeing to observe solely the Option Agreement's standards for conducting an appraisal, MPI elected to abide by both industry standards and the terms of the Option Agreement. Anticipating a potential conflict between those measures, MPI agreed to alert the parties if and when such friction arose. It seems that MPI and the party appraisers scrutinized the Option Agreement and incorporated only those provisions they thought necessary or desirable, and only to the extent they thought practical.

Furthermore, SLTPC's and MediaNews's letter to MPI makes no reference to the Option Agreement whatsoever. The response letter corrects at least one omission from MPI's letter, specifying that MPI will assume the accuracy of all information provided by the parties and will not directly examine the newspaper's files. Had the parties wished to add that Delaware law would govern the appraisal, they could have done so in the response letter.

Although they easily could have adopted the Option Agreement's choice-of-law provision by reference, they did not. Accordingly, we conclude that the Appraisal Agreement did not incorporate the Option Agreement's choice-of-law provision. Absent a choice-of-law provision, a federal court sitting in diversity must apply the forum state's choice-of-law principles, which in this case involves employing Utah's "most significant relationship" test. As discussed above, New

21

Jersey has the most significant relationship to the Appraisal Agreement. Therefore, the district court should adjudicate SLTPC's claims under New Jersey law.

## III

Because we hold that the Third Appraisal does not constitute an arbitration, we **REVERSE** the district court's order dismissing SLTPC's claims and **REMAND** for proceedings consistent with this opinion.