**SALT LAKE TRIBUNE PUBLISHING COMPANY, LLC, Plaintiff,**

v.

**AT & T CORPORATION and Kearns–Tribune, LLC, et al., Defendants.**

**MediaNews Group, Inc., and Kearns–Tribune, LLC, et al., Plaintiffs/Counterclaim Defendants,**

v.

**Philip G. McCarthey, et al., Defendants/Third–Party Plaintiffs,**

v.

**Deseret News Publishing Company, et al., Third–Party Defendants.**

**Salt Lake Tribune Publishing Company, LLC, Plaintiff,**

v.

**Management Planning, Inc., et al., Defendants.**

**Nos. 2:00–CV–00936ST, 2:03–CV–00176ST, 2:03–CV–00565ST.**

United States District Court, D. Utah, Central Division.

Jan. 27, 2005.

1162

ORDER DENYING THE McCARTHEY FAMILY'S MOTION FOR RECUSAL, PURSUANT TO 28 U.S.C. §§ 144 and 455(a)

CASSELL, District Judge.

United States District Judge Ted Stewart has been presiding over three related

cases dealing with, as the Tenth Circuit has called it, "a continuing fight over the ownership and control of *The Salt Lake Tribune*."[1] For nearly three years, the Salt Lake Tribune Publishing Company has attempted to have Judge Stewart removed from the case. The McCarthey Family has joined in that attempt for the last year. Judge Stewart has rejected three motions for recusal, and the Tenth Circuit has stated that no reasonable person, knowing the facts before the court, would "harbor doubts about [Judge Stewart's] impartiality."[2] Nevertheless, the McCarthey Family, joined by the Salt Lake Tribune Publishing Company ("SLTPC"), have again filed a motion for the recusal of Judge Stewart. The motion has been assigned to the undersigned judge for resolution. This motion raises mainly the same arguments that have been raised before. This court finds that the motion is untimely in part, and fully without merit. The motion is therefore DENIED.

## BACKGROUND

### *Ownership of The Salt Lake Tribune*

A brief background of the three cases pending before Judge Stewart is necessary to resolve this motion. The McCarthey Family members are former shareholders in the Kearns–Tribune Corporation (now Kearns–Tribune LLC). Kearns–Tribune is the owner of *The Salt Lake Tribune*. The McCarthey Family's interest in *The Tribune* dates back to 1901.

In 1997, the McCarthey Family conveyed its shares of Kearns–Tribune to Tele–Communications, Inc ("TCI"). In return, the McCarthey Family received shares of TCI stock. The McCarthey Family clearly wanted to retain control of *The Tribune*, however. So as part of the

transaction, the McCarthey Family and other former shareholders of Kearns–Tribune formed the SLTPC. SLTPC entered into a Management Agreement with TCI which gave SLTPC the right to manage *The Tribune* through July, 2002. Under a separate Option Agreement, SLTPC also retained the right to reacquire *The Tribune*. After purchasing Kearns–Tribune, Mr. Leo Hindery became the President and CEO of TCI. Under the direction of Mr. Hindery, TCI began attempting to sell *The Tribune*. In October, 1997, Mr. Hindery began negotiations with Dean Singleton, the President and CEO of MediaNews Group. In October, 1997, Mr. Hindery also began negotiations with Deseret News Publishing Company ("DNPC"). SLTPC was initially unaware of these negotiations.

In March, 1999, TCI merged with AT & T. As a result, AT & T became the owner of Kearns–Tribune and thereby *The Tribune*. AT & T, however, had no interest in owning a newspaper. So the negotiations for a sale of *The Tribune* to DNPC continued. Meanwhile, AT & T sent a letter to SLTPC suggesting interest in accelerating exercise of the Option Agreement. The letter noted, however, a possible conflict between the Option Agreement and the Joint Operating Agreement ("JOA") between *The Tribune* and the *Deseret News*, and stated that if the conflict could not be worked out AT & T would consider selling *The Tribune* to a third party approved by DNPC.

Although nearly consummated, the sale of *The Tribune* to DNPC could not be worked out. So in June, 2000, negotiations were reopened with MediaNews Group, and in September, 2000, DNPC consented to the sale of *The Tribune* to MediaNews. MediaNews agreed to pay $200,000,000 for *The Tribune*. MediaNews also agreed to

**1.** *In re McCarthey*, 368 F.3d 1266, 1268 (10th Cir.2004).

**2.** *Id.* at 1269.

work with DNPC to make certain changes to the JOA.

But there was still the problem of the Option Agreement. AT & T contacted representatives from SLTPC and, without informing them of the offer made by MediaNews, began negotiating with SLTPC for its potential reacquisition of *The Tribune* under the Option Agreement. On November 27, 2000, SLTPC made on offer of $180,000,000 to reacquire *The Tribune* as part of a proposed Acquisition Agreement. AT & T and SLTPC, however, could not reach an agreement. And on November 29, 2000, AT & T's Board of Directors approved a 200 million dollar sale of Kearns–Tribune to MediaNews. Because of the fear that the Option Agreement would still be enforceable, as part of the sale of *The Tribune* to MediaNews, AT & T agreed that if the price eventually paid under the Option Agreement was less than the $200 million MediaNews paid, AT & T would reimburse MediaNews up to $26 million. MediaNews also agreed that it was bound by the terms of the Management Agreement and the Option Agreement.

### Litigation History

In December, 2000, SLTPC filed the first of these related cases in an attempt to enforce the Option Agreement.[3] The suit by SLTPC sought (1) a preliminary injunction against AT & T, MediaNews, and Kearns–Tribune to prevent the sale of *The Tribune*, (2) a declaratory judgment that SLTPC had an enforceable option to reacquire *The Tribune*, and (3) specific performance of the Option Agreement. The case was originally assigned to Judge Tena Campbell, but she recused. After Judge Campbell's recusal (as well as subsequent recusals by Judge Sam and Chief Judge Benson), the case was randomly assigned to Judge Stewart on July 16, 2001. DNPC moved to intervene in the case in July, 2001, arguing that under the JOA it had the right to prevent SLTPC from exercising its option. Judge Stewart eventually ruled that the Option Agreement was valid and that SLTPC could enforce the agreement over the objection of DNPC.

A second related but unconsolidated case was filed by SLTPC and randomly assigned to Judge Stewart in June, 2003.[4] The issue in this case was the appraisal value of *The Tribune*. The Option Agreement gave SLTPC the right to reacquire *The Tribune* at "Fair Market Value." Under the terms of the agreement, each side was to provide an appraisal of *The Tribune*. If each party's appraisal differed by more than ten percent, the parties were to jointly agree upon a third appraiser. MediaNews' appraiser suggested a fair market value of $380 million. SLTPC's appraiser suggested a fair market value of $218 million. After some wrangling, a third appraiser was agreed upon. The third appraiser suggested a fair market value of $331 million. Under the terms of the agreement, the final fair market value was to be determined by averaging the value of the two closest appraisals. The result was a declared fair market value of $355.5 million.

SLTPC filed suit challenging the third appraisal. Judge Stewart ruled that the appraisal process established by the Option Agreement was effectively an arbitration subject to the Federal Arbitration Act, which meant that great deference was owed to the arbitration, and that SLTPC had not presented sufficient reasons to set

---

3. *Salt Lake Tribune Publishing Company, LLC., v. AT & T Corp., AT & T Broadband, LLC., et al.,* Case No. 2:00–CV–00936ST.

4. *Salt Lake Tribune Publishing Co., LLC v. Management Planning Inc., et al.,* Case No. 2:03–CV–00565ST.

aside the third appraisal. The Tenth Circuit reversed on technical grounds, holding that the appraisal process was not meant to be binding arbitration under the Federal Arbitration Act, and remanded for further proceedings.[5] Still left to be determined is what standard of review should be applied to the appraisal.

In the third related case, the McCartheys have alleged that they have the right, individually, to reacquire *The Tribune*. To enforce this right, on November 20, 2001, the McCartheys filed suit in a Colorado state court. The Colorado court stayed the proceedings, however, pending resolution of the related Utah federal court case. In an attempt to resolve all of these issues in one proceeding, on February 14, 2003, Kearns–Tribune and Media-News filed a declaratory judgment action in this court, seeking to have the court declare that the McCartheys have no individual claim to ownership of *The Tribune* through the Merger Agreement, the Option Agreement, or the Management Agreement.[6] That case was assigned to Judge Stewart on May 30, 2003, and was consolidated with SLTPC's lawsuit. The McCartheys were not a named party to any part of this litigation until the declaratory judgment action was filed.

### *Prior Recusal Motions*

On May 13, 2002, approximately ten months after Judge Stewart was assigned the first case, SLTPC sent a letter to Judge Stewart requesting that he make a formal disclosure of any facts which might be relevant to his ability to sit impartially on the case. The letter raised three specific requests. First, the letter noted that President Thomas S. Monson, a member of the First Presidency of the Church of Jesus Christ of Latter–Day Saints, would be a "key witness" in the litigation, and that SLTPC intended to question his credibility. The letter noted that Thomas Monson was formerly the president of DNPC and a signator of the 1982 JOA. The letter requested that Judge Stewart disclose whether he was a member in good standing of the LDS Church, along with any past interaction with Thomas Monson or other members of the hierarchy of the LDS Church. Second, the letter noted that SLTPC intended to seek significant damages from DNPC and that DNPC is owned by Deseret Management Company, which is in turn owned by the LDS Church. Any damages assessed against DNPC would affect the LDS Church. The letter further noted that some of the LDS Church's assets were held in the DMC Reserve Trust, of which all Church members are the ultimate beneficiaries. The letter requested information as to whether this meant that Judge Stewart, as a member of and contributor to the LDS Church, had a financial or equitable interest in the case that would create an appearance of bias. Third, the letter also noted that Governor Leavitt testified in his deposition that while he was governor, he had been contacted by Michael Armstrong, then Chairman of AT & T, and that he was told that the *Deseret News* would be buying *The Tribune* from AT & T. Governor Leavitt said he may have discussed the conversation with his staff. The letter asserted that Judge Stewart was a member of Governor Leavitt's staff at the time these events occurred and would perhaps be a material witness in the case. Finally, in a footnote, the letter also asked about Judge Stewart's interactions with Senator Orrin Hatch.

---

**5.** *Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.,* 390 F.3d 684 (10th Cir.2004).

**6.** *MediaNews Group, Inc. et al., v. Philip G. McCarthey, et al.,* Case No. 2:03–CV–00176ST.

The letter from SLTPC was filed under seal "out of courtesy to the court." The letter was apparently leaked, however, to a reporter for *The Tribune*. The reporter visited Judge Stewart's neighborhood and asked Judge Stewart's neighbors about his standing in the LDS Church. The day after the letter was filed with the court, *The Tribune* ran a story headlined "Impartiality at Issue in *Tribune's* Suit" which quoted from the letter. The McCarthey Family and SLTPC vigorously dispute that they were the source of the leak.

In an order dated May 16, 2002, Judge Stewart indicated that he would treat the letter as a motion for recusal under 28 U.S.C. § 455. Judge Stewart then denied the motion to recuse.

In evaluating all the facts relevant to the May 13, 2002 letter motion, the court finds as follows: I have no independent knowledge of any of the events at issue in this case. I have no bias or prejudice against or in favor of any party to this case. I am a member of The Church of Jesus Christ of Latter Day Saints. I have no personal relationship with President Monson. I have attended public meetings and public events where President Monson appeared. I do not have any financial interest in the subject matter of this case, or in a party to this case, or any other interest that could be substantially affected by its outcome.

During the time I served as a member of Governor Leavitt's staff I was aware that the Governor had a number of telephone conversations with Mr. Armstrong. To my knowledge, such conversations involved AT & T's investment in Utah regarding the expansion of its cable network. I do not recall being informed of any telephone call or other communication by Mr. Armstrong to Governor Leavitt regarding the pending

sale of *The Salt Lake Tribune* to the *Deseret News*. I believe that if I had been informed of such a communication I would have remembered it.[7]

SLTPC did not appeal Judge Stewart's ruling or file a motion for reconsideration.

On January 22, 2003, eight months after its original recusal motion was denied, SLTPC filed a Motion, Pursuant to 28 U.S.C. § 455, for Full Disclosure of Facts Relevant to Recusal and for Recusal. SLTPC alleged that this seemingly repetitive motion was appropriate because (1) it had learned new information in the May 16, 2002, order; (2) a newspaper story had confirmed the motivation of AT & T in attempting to sell *The Tribune* to DNPC; and (3) Judge Stewart's disclosures on the issue had been insufficient. The motion requested further disclosure with respect to two issues: (1) Judge Stewart's support for and involvement in the LDS Church; and (2) Judge Stewart's role as Chief of Staff to Governor Leavitt and his knowledge of AT & T's contemplated sale of *The Tribune* to DNPC. In support of its motion, SLTPC submitted as an affidavit the expert opinion of Professor Robert F. Drinan, S.J. regarding the meaning of the recusal statutes.

Judge Stewart ruled (1) that Professor Drinan's affidavit was inappropriate because courts do not take expert opinions on issues of law; (2) that the renewed motion to recuse was untimely; and (3) that the motion had no merit.

On the issue of timeliness, Judge Stewart noted that the renewed motion was little more than a motion to reconsider. Indeed, the motion relied on the same deposition testimony of Governor Leavitt as the prior motion, as well as Judge Stewart's membership in the LDS Church.

7. Order Denying Recusal and Ordering May 13, 2002 Letter Unsealed, Case No. 2:00–CV– 00936ST (May 16, 2002) (hereinafter "May 16, 2002, Order").

Judge Stewart first noted that a "tremendous amount" of judicial resources had been spent in the intervening eight months and that "Plaintiff's current position on why it delayed renewing its recusal motion is so at odds with its actions and positions before this court during the period of delay that its position cannot be deemed credible." [8] Perhaps most important, Judge Stewart noted that SLTPC's reasons for recusal were known to it at the time of the earlier motion. As Judge Stewart noted, timeliness is required under § 455 because otherwise "a party could, as in this case, extensively litigate before a court while knowing any purported basis for recusal and then bring forward those reasons only in the event it fails to prevail on the merits . . . ." [9]

Notwithstanding the untimeliness of the motion, Judge Stewart again set forth at length why there was no basis for recusal in the case.

I have no personal relationship with any member of the First Presidency of The Church of Jesus Christ of Latter-day Saints . . . or any other member of its hierarchy. Before I became a judge, I had very limited interactions with some members of The Church of Jesus Christ[ ] [of Latter-day Saint's] hierarchy, principally arising out of my various responsibilities in state government. Since I became a judge, I have had no relationship or dealings with any member of the hierarchy of The Church of Jesus Christ [of Latter-day Saints], including the First Presidency. I can say with complete confidence that if I were to pass the members of the First Presidency on the street, or meet them in a public place, they would not know or recognize me.

As a member, I do make voluntary financial contributions to The Church of Jesus Christ [of Latter-day Saints]. In light of the amount of such contributions compared to the total of such contributions worldwide and the relationship of the parties to this case to the entity that I contribute to, no reasonable person could believe that *any* outcome of this case would in any way affect me personally, financially or in any other way.

I hold no position of leadership in The Church of Jesus Christ. I do teach an adult Sunday School class, and from time to time, a class of youth.

Regarding the purported conversation between Governor Leavitt and Michael Armstrong about the possibility of AT & T selling the Tribune to the Deseret News Publishing Company, a conversation that apparently took place sometime in mid or late October 1999 when I was Chief of Staff, as I stated before, I am confident that if the contents of such conversation had been passed on to me by the Governor, or anyone else, that I would have remembered it. The contemplated transaction of a sale of one of the two major daily papers to the other is not something that I, or any reasonable person, would have forgotten, had its possibility been conveyed to me. I never saw or heard about any form of a notice, press release or memorandum conveying such information during the time I was in state government.

Plaintiff has not shown that the information from the conversation was ever recounted by the Governor to any member of his staff. However, even if it had been, it was not conveyed to me, probably for the following reason-my nomina-

---

8. Order Denying Plaintiff's Renewed Motion to Recuse, Case No. 2:00–CV–00936ST (March 17, 2003) (hereinafter "March 17, 2003, Order").

9. *Id.*

tion as a federal district court judge was approved by the Senate Judiciary Committee in late July 1999. Believing that events could then take place quickly, Governor Leavitt took immediate steps to name my successor.

My confirmation vote then took place on October 5, 1999. Expecting the Commission to be signed within days, the Governor introduced my successor to the staff and the public the very next day. My successor began to function immediately. I bade farewell to staff and members of the Governor's cabinet over the next couple of days. In addition to completing my work in state government, I also began the process of moving to the bench and setting up chambers. This continued for much of the month of October until my Commission was signed on Thursday, November 11, 1999. I was sworn in as a judge on Monday, November 15, 1999.

In the interim, although I was still technically the Chief of Staff to the Governor, my successor was also functioning in the role. We shared responsibilities for that period. Although I was still present in the Governor's Office, I represented the past. From October 6, 1999, forward, my successor was the future. It is possible that the Governor did share the content of a conversation about a proposed purchase of the newspaper with my successor, but I am confident that he did not share it with me.[10]

In his earlier order denying the motion for recusal, Judge Stewart had also directed that the letter on which the motion was based be unsealed. SLTPC challenged this unsealing in its second motion for recusal. Because Judge Stewart's response as to why he ordered the letter unsealed has become an issue in this most recent motion for recusal, it is also set forth at length:

Finally, Plaintiff continues to make much of the fact that the court unsealed Plaintiff's May 13, 2002 letter inquiring about grounds for recusal, disclosed that there were no grounds and so ruled. The court recognizes that lawyers do have a right, in fact an obligation, to their client to inquire of a court's ability to be fair and impartial if they have a reasonable basis for questioning a judge's impartiality. Questioning a judge's impartiality without a good faith basis and doing so in an undignified and disrespectful manner is inconsistent with a lawyer's professional responsibility.

The manner in which Plaintiff originally raised its questions, coupled with this meritless renewal after eight months and several adverse rulings raises questions about its good faith. A brief history of how the matter was initially raised with the court illustrates the point: The matter of recusal was first raised with the court when a letter was hand-delivered to chambers late in the afternoon of Monday, May 13, 2002. The letter was designated "Filed Under Seal."

I was not in chambers when the letter was delivered, nor was I in chambers the next day. Accordingly, the contents of the letter were not known to me. I did not know of the existence of the letter, or of the letter's contents, until chambers staff called me on Tuesday, May 14, 2002, to inform me that one of Plaintiff's reporters had called chambers to ask if I wished to comment on the supposedly sealed letter. At my request, the letter was opened and read to me over the telephone.

This telephone conversation with staff came upon the heels of a report from my next-door neighbor that one of Plaintiff's reporters had visited with her that same

10. *Id.*

afternoon and was inquiring as to my church affiliation and activity, what type of neighbor I was, what type of father I was, etc.

The Salt Lake Tribune, then managed exclusively by Plaintiff, ran a story on the sealed letter Wednesday morning, May 15, 2002, before I had personally even seen the purportedly sealed document.

This series of events, although not noted by the court in its May 16, 2002 Order, did then and again now, raise serious questions about whether Plaintiff has raised the recusal issue in good faith, or merely in an effort to undermine the court and overturn its rulings as part of a rather clumsy attempt to shop for a more favorable judge. This skepticism of Plaintiff's motive created by the manner in which the matter was initially raised is enhanced, as noted above, by the disingenuous representations made in this latest filing, and by its meritlessness and timing.[11]

These statements became the basis for SLTPC's next recusal motion. On April 18, 2003, SLTPC filed a Motion for Recusal Based on Statements Contained in the Court's Order of March 17, 2003. SLTPC argued that the statements made by Judge Stewart in his prior order indicated that "he has formed a bias against SLTPC, or that he at least appears to have formed such a bias . . . ." SLTPC's primary argument was that Judge Stewart's March 17, 2003 Order revealed that he mistakenly blamed SLTPC for leaking the "sealed" letter to The Tribune, which caused Judge Stewart to question the good faith of SLTPC. Specifically, Judge Stewart had noted that "[t]his series of events [relating

to The Tribune story about the letter], although not noted by the court in its May 16, 2002 Order, did then, and again now, raise serious questions about whether plaintiff has raised the recusal issue in good faith . . . ."[12] SLTPC argued that these statements, based on extrajudicial activities which SLTPC did not have a chance to respond to, revealed that Judge Stewart harbored a bias against SLTPC, or at least that a reasonable person would question his impartiality. On May 30, 2003, Judge Stewart denied SLTPC's third recusal motion, finding that it did not meet the standards for recusal under § 544.[13]

In May, 2003, the declaratory judgment case involving the McCarthey Family's rights under the Family Agreement was assigned to Judge Stewart. And in June, 2003, the appraisal case was also assigned to Judge Stewart. Five months later, on October 3, 2003, the McCarthey Family filed a Request for Full Disclosures by the Court. This motion, relying on § 455, again requested that Judge Stewart disclose "his contributions to the LDS Church . . . and his past dealings with the LDS Church leaders, general authorities and officials including the LDS Church First Presidency." On October 21, 2003, the McCarthey Family filed a Supplemental Request for Disclosures by the Court requesting further information concerning Judge Stewart's role as Governor Leavitt's Chief of Staff.

Shortly after filing the Supplemental Request, the McCarthey Family petitioned the United States Court of Appeals for the Tenth Circuit for a writ of mandamus ordering Judge Stewart to make the requested disclosures. Professor Drinan's

---

11. *Id.*

12. *Id.*

13. Order Denying Plaintiff's Third Motion to Recuse, Denying Request for Hearing, and Denying Request for Expedited Consideration as Moot, Case No. 2:00–CV–00936ST (May 30, 2003) (hereinafter "May 30, 2003, Order").

affidavit was submitted to the Tenth Circuit in support of the motion. The Tenth Circuit rejected the motion, stating:

> Judge Stewart has disclosed on the record that he has no independent knowledge of any of the events at issue in this case arising from his service in Utah state government or from anything else. He also disclosed that, although he voluntarily contributes to his church, he has no present or contingent financial interest in a party to, or the outcome of, this litigation. He has no leadership position in his church. Finally, he has told the parties that he has no bias or prejudice in favor of or against any party involved in this litigation.

> [T]he record facts simply demonstrate no personal bias or prejudice, nor would a reasonable person knowing these facts harbor doubt about the judge's impartiality. Judge Stewart has addressed Petitioners' concerns regarding actual bias, extrajudicial knowledge of events and persons, and participation in the affairs of a stakeholder .... [14]

In sum, the Tenth Circuit denied the petition for a writ of mandamus, held that Judge Stewart had satisfied the disclosure requirements of § 455, and, based upon these satisfactory disclosures, held that there was nothing to indicate personal bias or prejudice "nor would a reasonable person knowing these facts harbor doubts about the judge's impartiality." [15]

The Tenth Circuit's order was entered on May 26, 2004. On November 29, 2004, the McCarthey Family, now joined by SLTPC, filed the instant Motion, Pursuant to 28 U.S.C. §§ 144 and 455(a), for Recusal. Submitted with the motion is the affidavit of Philip G. McCarthey. The current motion raises six arguments as to why Judge Stewart cannot be impartial:

- Judge Stewart's statements in his March 17, 2003 Order wrongly imputed to SLTPC and the McCarthey Family an attempt to invade his privacy, and demonstrate his prejudice against SLTPC and the McCarthey Family;
- *The Tribune's* negative reporting on Judge Stewart's nomination and service in Utah government create the appearance of bias;
- Judge Stewart's gratitude to Senator Orrin Hatch, who actively supported Judge Stewart's nomination, creates the appearance of impartiality because Senator Hatch supported DNPC's attempts to acquire *The Tribune;*
- Judge Stewart's service as Chief of Staff to Governor Leavitt exposed him to events and parties at issue in this case and will make it difficult for him to be objective;
- Judge Stewart's actions in the SLTPC litigation reveal a bias against the McCarthey Family. These events include: MediaNews' and DNPC's switch in strategy on jurisdiction when the case was assigned to Judge Stewart; Judge Stewart's ruling that many of the facts presented by SLTPC concerning Governor Leavitt's knowledge of DNPC's attempts to acquire *The Tribune* were irrelevant; Judge Stewart's ruling granting summary judgment to AT & T and AT & T Broadband; Judge Stewart's statement in a July 22, 2002 Order that SLPTC's "owners knew there was a risk in giving up legal ownership" of *The Tribune;* and Judge Stewart's statement that he did not believe the McCarthey Family's claims were separate from SLTPC's claims; and finally
- Judge Stewart cannot be impartial because of the McCarthey Family's at-

---

**14.** *In re McCarthey,* 368 F.3d at 1269.

**15.** *Id.*

tempt to obtain a writ of mandamus from the Tenth Circuit after Judge Stewart failed to make the requested disclosures.

The court will set forth the relevant legal standards below and address each of the above allegations in turn.

### DISCUSSION

The McCarthey Family and SLTPC have moved for recusal under two separate provisions of federal law, 28 U.S.C. § 144 and 28 U.S.C. § 455(a). Neither provision explicitly provides for referral of a recusal motion to another judge. But "if the issue of a judge recusing [him]self arises either through a motion to recuse under § 455 or an affidavit of prejudice under § 144, the judge has the option to either transfer the matter to another judge for decision or determine it [him]self." [16] Pursuant to those provisions, this recusal motion has been transferred to the undersigned judge.

Under 28 U.S.C. § 455(a), a judge is required to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." [17] As noted by the Tenth Circuit earlier in this litigation, § 455(a) contains an objective standard which requires disqualification "only where the reasonable person, were he to know all

the circumstances, would harbor doubts about the judge's impartiality." [18] This means that the judge "must recuse himself when there is the appearance of bias, regardless of whether there is actual bias." [19] Where the question is close, the judge should recuse. [20]

But § 455(a) does not require recusal "based on unsubstantiated suggestions of personal bias or prejudice." [21] Rather, the inquiry is "limited to outward manifestations and reasonable inferences drawn therefrom." [22] Finally, while § 455(a) does not explicitly contain a timeliness requirement, the Tenth Circuit has held that " § 455(a) motions for recusal must be timely filed." [23] A recusal motion is untimely if the party seeking recusal fails "to act promptly once it knows of the facts on which it relies in its motion." [24]

Under 28 U.S.C. § 144, the standard for recusal is higher, but the procedural requirements are different. Section 144 states that a judge "shall proceed no further" in the case if the party seeking recusal files a "timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party . . . ." [25] If properly pleaded, all of the factual allegations in the affidavit must be taken as true for purposes of the motion under § 144, and the court decides

**16.** *Maldonado v. Ashcroft*, 108 Fed.Appx. 221, 222 (5th Cir.2004); *see also United States v. Heldt*, 668 F.2d 1238, 1271 (D.C.Cir.1981) (trial court may "at its option" transfer § 455 motion to another judge for decision).

**17.** 28 U.S.C. § 455(a).

**18.** *In re McCarthey*, 368 F.3d at 1269.

**19.** *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 659 (10th Cir.2002).

**20.** *Id.*

**21.** *Id.*

**22.** *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir.1993).

**23.** *Willner v. University of Kansas*, 848 F.2d 1023, 1028 (10th Cir.1988), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989).

**24.** *United States v. Pearson*, 203 F.3d 1243, 1276 (10th Cir.2000), *cert. denied*, 530 U.S. 1268, 120 S.Ct. 2734, 147 L.Ed.2d 995 (2000).

**25.** 28 U.S.C. § 144.

only whether the affidavit is timely and legally sufficient.[26]

■ But while § 455(a) requires a judge to recuse himself when there is a reasonable appearance of bias, § 144 requires the moving party to prove actual bias. "Disqualification under 28 U.S.C. § 144 places a substantial burden on the moving party to demonstrate that the judge is not impartial, not a burden on the judge to prove that he is impartial."[27] Moreover, "[t]he affidavit is strictly construed against the affiant" and mere "conclusions, rumors, beliefs, and opinions are not sufficient to form a basis for disqualification. The affidavit must state with required particularity the identifying facts of time, place, persons, occasion, and circumstances."[28] The party moving for recusal "must show facts indicating the existence of a judge's personal bias and prejudice" and allegations which "establish simply that the affiant does not like a particular judge are not adequate to require disqualification."[29] Section 144's explicit timeliness requirement requires that the affidavit be filed "promptly after the allegedly disqualifying facts are discovered."[30]

Because § 144 requires a showing of actual bias whereas § 455(a) requires only the reasonable appearance of bias, it is generally presumed that, at least substantively, § 144 is "subsumed under ... § 455."[31] But because of the procedural differences, where necessary each allegation of bias will be considered under both sections.

### 1. Statements in March 17, 2003 Order

■ The McCarthey Family and SLTPC first allege that certain statements made by Judge Stewart in his March 17, 2003, order reflect an actual bias and create the reasonable appearance of bias. Specifically, Philip McCarthey's affidavit states that "Judge Stewart charged SLTPC and its counsel with filing bad faith motions based on the Judge's erroneous conclusion that SLTPC or its counsel filed the motions only to create a news story concerning his Honor in what Judge Stewart characterized as a 'clumsy' attempt to shop for a more favorable judge."[32] Judge Stewart's "assumptions gained from his extrajudicial interview with his neighbor" are, according to the affidavit, "evidence of bias and prejudice against [the McCarthey Family] and [SLTPC]."[33] Section 455(a) requires disqualification when a judge's "impartiality might reasonably be questioned." Section 455(b)(1), however, is more precise than § 455(a). Section 455(b)(1) requires disqualification when a judge "has a personal bias or prejudice," the same language used in § 144. While the current motion was brought under subsection (a), the Tenth Circuit has held that "when a ground for disqualification is addressed specifically in subsection (b), the limitations applicable to that subsection are generally contained within subsection (a)'s general standard as well."[34] In other words, as stated by the Ninth Circuit, subsection (b)(1) "simply

---

**26.** *United States v. Bray,* 546 F.2d 851, 857 (10th Cir.1976).

**27.** *In re McCarthey,* 368 F.3d at 1269.

**28.** *Hinman v. Rogers,* 831 F.2d 937, 939 (10th Cir.1987).

**29.** *Id.*

**30.** *Id.* at 938.

**31.** 13A Wright & Miller § 3541.

**32.** McCarthey Aff. ¶ 36.

**33.** *Id.* at ¶ 37.

**34.** *United States v. Young,* 45 F.3d 1405, 1415 (10th Cir.1995), *cert. denied,* 515 U.S. 1169, 115 S.Ct. 2633, 132 L.Ed.2d 872 (1995).

provides a specific example of a situation in which a judge's 'impartiality might reasonably be questioned.' " [35]

One of the limitations in subsection (b) which applies to subsection (a) is the "extra-judicial source" doctrine. In *Liteky v. United States*,[36] the Supreme Court addressed this doctrine. The Court first noted that "bias and prejudice ... are pejorative terms, describing dispositions that are *never* appropriate." [37] And while §§ 144 and 455(b)(1) require a showing of bias or prejudice, "[n]ot all unfavorable disposition towards an individual (or his case) is properly described by those terms.... The words connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate* ...." [38] A judge, for example, may come to believe during a trial that the defendant is "a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings ...." [39] In sum, "the pejorative connotation of the terms 'bias' and 'prejudice' demands that they be applied only to judicial predispositions that go beyond what is normal and acceptable." [40] The same is true of the "partiality" standard used in § 455(a). " 'Partiality' does not refer to all favoritism, but only to such as is, for some reason, wrongful or inappropriate. Impartiality is not gullibility." [41]

■ The "extra-judicial source" doctrine recognizes that bias, prejudice, and partiality requiring recusal are most likely to be found in cases where the judge's improper disposition towards a party is based on information learned outside of the judicial process. But "[t]he fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for 'bias or prejudice' recusal .... Nor is it a *sufficient* condition for 'bias or prejudice' recusal." [42]

Thus, judicial remarks during the course of a trial [or in an order] that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. ... *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.[43]

A review of Judge Stewart's comments in his March 17, 2003, order reveals that a small part of the comments are based on what might be classified as extra-judicial information. After ruling that the underlying recusal motion was untimely and lacked merit, Judge Stewart turned to the May 13, 2002, letter which was filed under seal but became the basis of a *Tribune* reporter's inquiries the next day. In what Judge Stewart himself referred to as "dicta remarks," [44] the order stated that "[t]he

---

**35.** *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir.1980).

**36.** 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

**37.** *Id.* at 549, 114 S.Ct. 1147.

**38.** *Id.* at 550, 114 S.Ct. 1147.

**39.** *Id.* at 551, 114 S.Ct. 1147.

**40.** *Id.* at 552, 114 S.Ct. 1147.

**41.** *Id.*

**42.** *Id.* at 554, 114 S.Ct. 1147.

**43.** *Id.* at 555–56, 114 S.Ct. 1147.

**44.** May 30, 2003, Order.

manner in which Plaintiff originally raised its questions, coupled with this meritless renewal after eight months and several adverse rulings raises questions about its good faith." [45] SLTPC and the McCarthey Family focus on three particular comments. First, Judge Stewart stated that he first became aware of the letter when he was told by his next-door neighbor "that one of Plaintiff's reporter had visited with her [the day after the sealed letter was filed with the court] and was inquiring as to my church affiliation and activity, what type of neighbor I was, what type of father I was, etc." [46] Second, Judge Stewart then noted that *"The Salt Lake Tribune,* then managed exclusively by Plaintiff, ran a story on the sealed letter [the next day] before I had personally even seen the purportedly sealed document." [47] Third, Judge Stewart stated that "[t]his series of events, although not noted by the court in its May 16, 2002 Order, did then, and again now, raise serious questions about whether Plaintiff has raised the recusal issue in good faith, or merely in an effort to undermine the court and overturn its rulings as part of a rather clumsy attempt to shop for a more favorable judge." [48]

According to SLTPC and the McCarthey Family, these statements reveal that Judge Stewart, based on extra-judicial information including a report from a neighbor, attributed the leak of the sealed letter to SLTPC and the McCarthey Family, which in turn led him to question the good faith of both the first and second recusal motions. SLTPC and the McCarthey Family also make much of the fact that Judge Stewart presided over the case for ten months before he noted these concerns in ruling on the second motion for recusal.

As explained above, for purposes of the § 144 motion, this court must accept as true the factual allegations in Mr. McCarthey's affidavit to see whether they establish bias or prejudice. This court is not required to accept, however, Mr. McCarthey's conclusion that Judge Stewart's order is "evidence of bias and prejudice against me, my family and our company, SLTPC." [49] For purposes of § 455(a), this court looks at all of the circumstances to determine whether Judge Stewart's impartiality might reasonably be questioned.

Viewed under either standard, these facts do not establish bias or prejudice or the reasonable appearance of bias or prejudice. Judge Stewart's comments reveal no more than the fact that he was suspicious about the leak of the letter to *The Tribune.* According to Judge Stewart, the leak of the sealed letter to the Plaintiff's newspaper on the same day the letter was filed with the court, and before the court had even opened it, raised "questions" about the motives behind the recusal motion. These "questions" would naturally come to the mind of any judge presented with this series of events. Judge Stewart's statements reveal no personal bias or prejudice which would lead him to decide the case on anything other than the merits. Indeed, it is clear that Judge Stewart's concerns played no role in his decision on the motions to recuse. Even the "questions" Judge Stewart raised were primarily based on the "disingenuous representations" in the motion "and by its meritlessness and timing." [50]

Finally, in any event, statements made by a judge during court proceedings, including statements about the good faith

---

**45.** March 17, 2003, Order.

**46.** *Id.*

**47.** *Id.*

**48.** *Id.*

**49.** McCarthey Aff. ¶ 37.

**50.** March 17, 2003, Order.

of a plaintiff, do not constitute grounds for recusal.[51] Unfortunately, a judge sitting on a case may have occasion to question whether a certain motion was filed in good faith. Doing so does not prove actual bias or create the reasonable appearance of bias.

### 2. The Tribune's Negative Reporting About Judge Stewart

 As a second basis for recusal, the McCarthey Family and SLTPC argue that they believe that Judge Stewart is biased against them because of articles written by *The Tribune* in 1999 which were critical of Judge Stewart's nomination to the bench and which recounted mistakes he allegedly made in his first months on the bench.

This portion of the motion is untimely as to SLTPC. The articles were certainly known to SLTPC from the very beginning of this litigation. They cannot be raised five years later as a basis for recusal.

With respect to the McCarthey Family, the argument lacks merit. First, the affidavit is insufficient under § 144. The affidavit does nothing more than state Mr. McCarthey's "belief" that Judge Stewart is biased because of *The Tribune's* negative reporting.[52] But mere "conclusions ... beliefs, and opinions are not sufficient to form a basis for disqualification."[53] Mr. McCarthey's belief hardly establishes actual bias, which is the standard under § 144.

 The allegations also fail under § 455. Newspaper articles criticizing a judge's performance are not unusual.

More important, a party cannot create a basis for recusal by first criticizing a judge and then claiming the judge is biased as a result. "It is well settled that prior written attacks upon a judge are legally insufficient to support a charge of bias or prejudice on the part of the judge toward the author of such a statement."[54] Forcing judges to recuse because a litigant has criticized the judge would give litigants veto power over judges and allow forum shopping.[55] It would also "stretch the recusal statutes far beyond their intended purpose and potentially force disqualifications in a large number of cases."[56]

### 3. Judge Stewart's Ties to Senator Orrin Hatch

 As a third alleged reason for recusal, it is argued that Judge Stewart's ties to Senator Orrin Hatch "raise an issue as to the impartiality of Judge Stewart concerning the facts in the case."[57] Mr. McCarthey's affidavit alleges that Senator Hatch actively supported the sale of *The Tribune* to DNPC and told AT & T that such a sale would not violate antitrust laws. At his swearing-in ceremony, Judge Stewart expressed his gratitude to Senator Hatch for supporting his nomination in the Senate. Therefore, the affidavit states, "Judge Stewart's gratitude to Senator Hatch ... coupled with the other facts described in this affidavit, raise an issue as to the impartiality of Judge Stewart concerning the facts in this case."[58]

 These allegations come nowhere near the standard required either by § 144

---

**51.** *Johnson v. Trueblood,* 629 F.2d 287, 291 (3d Cir.1980) (recusal not required where judge referred to defendants as "honest men of high character" and questioned motives of plaintiffs).

**52.** McCarthey Aff. ¶ 41.

**53.** *Hinman,* 831 F.2d at 939.

**54.** *Bray,* 546 F.2d at 858.

**55.** *United States v. Evans,* 262 F.Supp.2d 1292, 1296–97 (D.Utah 2003).

**56.** *Id.* at 1297.

**57.** McCarthey Aff. ¶ 46.

**58.** *Id.*

or § 455. Even taking the factual allegations in the affidavit as true, this court would have to speculate from them that Senator Hatch desires a certain outcome in this case (regardless of the merits), and that Judge Stewart is willing to set aside his oath to be impartial in order to please Senator Hatch. "A judge should not recuse himself on unsupported, irrational or highly tenuous speculation." [59] Moreover, the affidavit does no more than suggest that Judge Stewart's ties to Senator Hatch "raise an issue" about his impartiality. But affidavits under § 144 must do more than suggest potential problems; they must set forth facts which establish actual bias. [60]

In a similar situation, the First Circuit noted that "[i]t is common knowledge, or at least public knowledge, that the first step to the federal bench for most judges is either a history of active partisan politics or strong political connections or ... both." [61] In that case, the judge acknowledged a "close personal relationship" with Senator John Chafee and the affidavit stated that Senator Chafee was responsible for the judge's appointment. The court ruled, however, that the judge was not required to recuse himself from a case involving the Senator's former law firm and the Senator's cousin. Such a "tenuous link ... would not even raise an eyebrow of the reasonable person objectively assessing the Judge's impartiality." [62]

Likewise, here the link between Judge Stewart's gratitude to Senator Hatch, Senator Hatch's alleged support of the sale of *The Tribune* to DNPC, and the merits of this case, are so attenuated that no reason-

able person would take them as evidence that Judge Stewart is incapable of being impartial in this matter.

### 4. Judge Stewart's Service as Chief of Staff to Governor Leavitt

 The fourth set of facts allegedly requiring recusal involve Judge Stewart's service as Chief of Staff to Governor Leavitt in 1999. To deal with this issue, some further factual development is necessary.

After Kearns–Tribune and MediaNews filed the consolidated declaratory judgment action, the McCarthey Family filed a counterclaim. The McCarthey Family's claims are based on what has been referred to as the "Family Agreement." This agreement allegedly grew out of the same transactions which produced the Merger Agreement, Option Agreement, and Management Agreement. According to the counterclaim, the terms of this agreement included: (1) a promise to the McCarthey Family that the assets of *The Tribune* would not be materially changed during the time it was owned by a third-party; (2) a promise to the McCarthey Family that a new entity, created as part of the merger, would have the right to manage *The Tribune* during the time it was owned by a third-party; (3) a promise to the McCarthey Family that a new entity, created as part of the merger, would have the right to reacquire *The Tribune;* and (4) a promise to the McCarthey Family that the reacquisition price would be set through the same method used to value *The Tribune* for purposes of the 1997 Kearns–Tribune–TCI merger.

The McCarthey Family alleges that had these agreements not been made specifi-

**59.** *Hinman,* 831 F.2d at 939.

**60.** *Botts v. United States,* 413 F.2d 41, 43 (9th Cir.1969) (statement that judge "may have" said something establishing nothing more than that the judge "may have" made the statements).

**61.** *Home Placement Service, Inc. v. Providence Journal Co.,* 739 F.2d 671, 675 (1st Cir.1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969 (1985).

**62.** *Id.*

cally to the Family, the Kearns–Tribune–TCI merger would not have occurred and *The Tribune* would have never changed hands because the McCartheys would have refused to sell their shares of Kearns–Tribune. All of the shareholders of Kearns–Tribune did sell their shares to TCI, but, according to the counterclaim, the McCarthey Family did so subject to the Family Agreement.

According to Mr. McCarthey's affidavit, there was a two-part "scheme" in place to deprive the McCartheys of their rights under the Family Agreement. The first part of the scheme was a plan by AT & T to sell *The Tribune* to DNPC rather than SLTPC. According to the affidavit, AT & T's efforts to sell the *Tribune* to DNPC were driven by a desire to protect its Utah cable franchise and to curry favor with the LDS Church and Utah's political leaders. It was during the negotiations between AT & T and DNPC that Michael Armstrong, AT & T's CEO, called Governor Leavitt. According to Mr. McCarthey's affidavit, "Armstrong had several conversations with Governor Leavitt about the proposed sale to DNPC." [63] Governor Leavitt's deposition reveals that he remembers discussing the proposed transaction with Michael Armstrong on a couple of occasions. According to Governor Leavitt, he told Mr. Armstrong that the transaction would be controversial, but he said little else because "it was not my interest or my instinct to be in the middle of it . . . ." [64] Governor Leavitt also testified at his deposition that he met with attorneys for the *Deseret News* on one occasion at which the transaction was discussed. He testified that the meeting was basically informational and that he was not asked for a reaction to the proposed transaction, nor did he offer one: "Well, my—as I indicated earlier, it was evident to me that this is a transaction that would not be without some controversy, and it was not then and it is not now my desire to be in the middle of it. And so I feel confident that I chose only to receive their information." [65] The McCarthey Family has produced a memo from Glen Snarr, chairman of DNPC, to the First Presidency of the LDS Church stating that Mr. Armstrong had called Governor Leavitt about the transaction and that "[w]e believe the governor was probably supportive and definitely not negative to our cause." [66]

Judge Stewart was Chief of Staff to Governor Leavitt during these times. Governor Leavitt was asked during his deposition whether he had any discussions with his staff about the proposed sale of *The Tribune* to DNPC: .

Q. Well, I really would like from the time that you learned, and I take it that you learned, you first learned of this potential transaction from a phone call, a phone call or meeting with Mr. Armstrong; is that fair?

A. Yes. You know, I have no specific recollection of any specific conversation. It's a small group and it's a tight organization and so it's conceivable that it occurred, but I have no specific recollection of any of them.

. . . .

Q. Do you generally recall these topics being a topic discussed among your executive staff?

A. I think it falls into the category of I suspect we probably talked about it, but I have no specific recollection of who or when or what would have been said.[67]

---

63. McCarthey Aff. ¶ 50.

64. Leavitt Depo. at 24.

65. Leavitt Depo. at 32–33.

66. McCarthey Aff. ¶ 49.

67. Leavitt Depo. at 37–38.

Mr. McCarthey's affidavit also states that Judge Stewart "has disclosed that [he] knew of calls from AT & T's Armstrong to Governor Leavitt in 1999 regarding AT & T's cable interests in Utah." [68] That is only half of Judge Stewart's disclosure; Judge Stewart also stated that he did not recall "being informed of any telephone call or other communication by Mr. Armstrong to Governor Leavitt regarding a pending sale of *The Salt Lake Tribune* to the *Deseret News*." [69] Judge Stewart expanded on this in his March 17, 2003 order, where he explained that the conversations between Mr. Armstrong and Governor Leavitt took place after his replacement had already been named. Judge Stewart concluded: "It is possible that the Governor did share the content of a conversation about a proposed purchase of the newspaper with my successor, but I am confident that he did not share it with me." [70]

The sale of *The Tribune* to DNPC fell through. The second part of the plan, according to Mr. McCarthey's affidavit, was to sell *The Tribune* to "the Church-friendly hands of MNG." [71] According to the affidavit this was done "well knowing that as part of the arrangement MNG, with the assistance of DNPC, would impair the Family's rights under the Family Agreement through substantive amendments to the 1952 Joint Operating Agreement." [72]

Mr. McCarthey's affidavit sums up the issue in these terms:

> While Judge Stewart was serving as Chief of Staff to the former Governor of Utah, Judge Stewart was part of an office that had received communications and contacts from AT & T's highest officer and DNPC's and DMC's representatives regarding the sale of the *Tribune*. These events were known by the former Governor to be controversial. DNPC has reported in the *Deseret News* that former Governor Leavitt, Senator Hatch, and President Hinckley of the LDS church are among the most powerful and influential people of Utah, stating they run or control all of the most significant evens in the state.... Neither the Governor nor any members of his staff, including Judge Stewart, took any action to report to SLTPC or the Family the DNPC, DMC and AT & T contacts. These contacts are a part of my Family's civil conspiracy claims of contract interference against AT & T, DNPC and DMC and may well be the subject of discovery from Judge Stewart's former boss, employers and associates. [73]

In a roundabout way, three arguments are raised that Judge Stewart's time as Chief of Staff to Governor Leavitt requires his disqualification. The first argument, raised under § 455(a), is based solely on Judge Stewart's ties to Governor Leavitt and his associates. As stated in the McCarthey Family's Reply Memorandum: "Obviously, as Chief of Staff to former Governor Leavitt, Judge Stewart will find it extremely difficult, if not impossible, to be unbiased in presiding over a case in which some of the contested evidentiary facts depend upon or involve his former employer, his other coworkers on the former Governor's staff, and his political mentor." [74] The second argument, citing

---

68. McCarthey Aff. at 53.

69. May 16, 2002, Order.

70. Mar. 17, 2003, Order.

71. *Id.*

72. *Id.*

73. McCarthey Aff. ¶ 61.

74. Reply Memo. at 9.

§ 455(b)(1), is that Judge Stewart is required to recuse because he has personal knowledge of disputed evidentiary facts. The McCarthey Family insists they did not raise this argument as their motion was brought solely under subsection (a) of § 455. SLTPC has vigorously pressed this argument, however. The third argument essentially raises both of these same issues under § 144. The court will address these arguments in reverse order.

Inasmuch as SLTPC has tacked itself onto the McCarthey Family's motion for recusal based on these facts, the court finds that their motion is nothing more than a motion for reconsideration and is untimely. Judge Stewart's service as Chief of Staff to Governor Leavitt has been known to SLTPC since at least the May 16, 2002 order denying recusal. These facts have been the basis for three prior recusal motions by SLTPC, all of which were denied by Judge Stewart. So while the court will also deny the motion on its merits, as a separate independent holding the court finds that the motion is untimely with respect to SLTPC. Because this is the first time the McCarthey Family has raised these issues, and because the McCartheys are more recent parties to this case, the court will proceed to address the merits with respect to their motion.

#### a. Section 144

Under § 144, the facts set forth in the affidavit must show that Judge Stewart has a "personal bias or prejudice either against . . . or in favor" of any party as a result of his time on Governor Leavitt's staff. The court again notes that it must take the factual allegations in the affidavit as true. But the court is not required to accept as true the conclusions, beliefs, and opinions stated in the affidavit.

Mr. McCarthey's affidavit does not demonstrate any bias or prejudice on the part of Judge Stewart. "Disqualification under 28 U.S.C. § 144 places a substantial burden on the moving party to demonstrate that the judge is not impartial, not a burden on the judge to prove that he is impartial." [75] Mr. McCarthey's affidavit establishes, at most, that Judge Stewart was a member of Governor Leavitt's staff, that Governor Leavitt was aware of the proposed sale of *The Tribune* to DNPC, that Governor Leavitt knew the sale would be controversial, and that Governor Leavitt may have told his staff. None of these facts establish any bias or prejudice on the part of Judge Stewart. Moreover, the McCarthey Family is not claiming that Judge Stewart has personal knowledge of disputed facts, which would require recusal under § 455(b)(1). As conceded by the McCarthey Family in the Reply Memorandum, "nowhere in the Affidavit or the memorandum does the McCarthey Family claim or imply that Judge Stewart has actual knowledge of these facts or may be a material witness." [76] The sole basis for the bias claim is that "Judge Stewart will find it extremely difficult, if not impossible, to be unbiased in presiding over a case in which some of the contested evidentiary facts depend upon or involve his former employer, his other coworkers on the former Governor's staff, and his political mentor." [77] The mere fact that Judge Stewart worked for (and presumably had a good relationship with) a party who may be a peripheral witness to some underlying event does not establish any bias or prejudice. The affidavit shows that Governor Leavitt's role in this case is at most peripheral, largely (if not wholly) undisputed, and perhaps entirely irrelevant. First, as Judge Stewart noted in his March 17, 2003

---

75. *In re McCarthey,* 368 F.3d at 1269.

76. Reply Memorandum at 9.

77. *Id.*

order, "the information about the potential, but ultimately unconsummated, sale to Deseret News Publishing is not a disputed fact in this case."[78] Based on the affidavit, assuming Governor Leavitt were called to testify, his testimony would simply confirm this already-undisputed evidence. Second, even assuming for purposes of this motion that there was a scheme to deprive the McCarthey Family of its rights under the "Family Agreement," nothing in the affidavit establishes that Governor Leavitt or his staff played any role in that scheme.

Finally, friends, former associates, and even foes of judges appear before them routinely. The circumstances surrounding such appearances vary widely. But such associations certainly do not automatically require a judge to disqualify himself. In this case, Judge Stewart's former employer's role is so peripheral to the central events that no plausible basis for recusal exists.

In sum, nothing in Mr. McCarthey's affidavit even remotely establishes any bias or prejudice on the part of Judge Stewart as a result of his time serving as Chief of Staff to Governor Leavitt. Judge Stewart's ties to Governor Leavitt were, of course, one of the issues before the Tenth Circuit during the McCarthey Family petition for a writ of mandamus. While the Tenth Circuit was dealing only with a petition for a writ of mandamus and not a motion for recusal, the Tenth Circuit looked at substantially the same facts and found that "the record facts demonstrate no personal bias or prejudice, nor would a reasonable person knowing these facts harbor doubts about the judge's impartiality."[79] The same conclusion applies to this motion. As the Seventh Circuit has stat-

ed, "The disqualification of a judge for actual bias or prejudice is a serious matter, and it should be required only when the bias or prejudice is proved by compelling evidence."[80] Mr. McCarthey's affidavit presents no evidence that Judge Stewart's service as Chief of Staff to Governor Leavitt has left him biased or prejudiced with respect to the parties or facts of this case.

### b. Section 455(b)(1)

Section 455(b)(1) requires recusal when a judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." Although it appears that most of the presented facts are directed toward this section, the McCarthey Family has specifically declaimed any attempt to have Judge Stewart recused based on § 455(b)(1). SLTPC, however, has taken a more aggressive stance, alleging that Judge Stewart in fact "has personal knowledge of critical facts and may, in fact, have been entangled, through Governor Leavitt, in the very alleged conspiracy that has been alleged to prevent the McCarthey Family from regaining control of *The Tribune*."[81]

As explained above, SLTPC's claims with respect to the allegations surrounding Judge Stewart's service as Chief of Staff to Governor Leavitt are untimely. Even if the allegations were timely, however, they lack merit. First, the McCarthey Family has specifically denied making any claim that Judge Stewart has actual knowledge of any of the facts surrounding this case. Second, Judge Stewart has himself explained in detail that he has no such knowledge. Where a judge has denied an allegation on the record, "in the absence of

---

78. March 17, 2003, Order.

79. *In re McCarthey*, 368 F.3d at 1269.

80. *United States v. Balistrieri*, 779 F.2d 1191, 1202 (7th Cir.1985), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986).

81. Supporting Memo. at 4.

contrary evidence ([a] mere assertion not being evidence), [the court] must credit the denial." [82] Third, from the materials before this court it is evident that Governor Leavitt's role is at most peripheral. Finally, the Tenth Circuit has already ruled that Judge Stewart has made full disclosure on this issue as required by § 455. And in viewing those disclosures the Tenth Circuit came to the conclusion there was no evidence of bias or prejudice. [83] There is simply no evidence that Judge Stewart has any knowledge of disputed facts in this case.

### c.　Section 455(a)

 Section 455(a) requires recusal when there is the appearance of bias, regardless of any actual bias. [84] But the inquiry is "limited to outward manifestations and reasonable inferences drawn therefrom." [85] For the same reasons previously discussed, there is nothing before this court which would lead a reasonable person to question the impartiality of Judge Stewart because of his service as Chief of Staff to Governor Leavitt. Again, the Tenth Circuit has looked at essentially the same facts and found no evidence of bias or prejudice, "nor would a reasonable person knowing these facts harbor doubts about the judge's impartiality." [86]

### 5.　Events in the SLTPC Litigation Over The Tribune

 The McCarthey Family alleges that certain events which occurred during this litigation before they were a party demonstrate that Judge Stewart is predisposed to rule against them. Each of these will be discussed in the order set forth by Mr. McCarthey's affidavit.

### a.　Statements and Position of Litigants

Mr. McCarthey alleges in his affidavit that when the SLTPC case was assigned to Judge Stewart, Dean Singleton, CEO of MediaNews, "told Dominic Welch and Randy Frisch of SLTPC that '[y]ou will not win against me and the Deseret News with a Mormon judge.'" [87] The affidavit further alleges that MediaNews and DNPC flip-flopped on the issue of jurisdiction after the case was assigned to Judge Stewart. "I believe these actions, statements, and changes in position on federal jurisdiction show that MNG, DNPC and DMC had insight and reasons to believe that Judge Stewart would favor their side." [88]

Mr. McCarthey's *beliefs* are irrelevant to this matter. Taking the *factual* allegations in the affidavit as true establishes at most that Mr. Singleton made an ignorant comment and that MediaNews and DNPC switched their position on jurisdiction. Even if the motivation for these actions was *their* belief that Judge Stewart would be a favorable judge, this reveals only the mind of the litigants, not the thoughts of Judge Stewart. This court finds, therefore, that these allegations establish neither bias or prejudice under § 144, or the reasonable appearance of bias or prejudice under § 455.

Moreover, raising the alleged comment of Mr. Singleton appears to be a backdoor attempt to relitigate the prior recusal

---

**82.**　*United States v. Boyd,* 208 F.3d 638, 647 (7th Cir.2000), *remanded on other grounds by* 531 U.S. 1135, 121 S.Ct. 1072, 148 L.Ed.2d 949 (2001).

**83.**　*In re McCarthey,* 368 F.3d at 1267.

**84.**　*Bryce,* 289 F.3d at 659.

**85.**　*Id.*

**86.**　*In re McCarthey,* 368 F.3d at 1269.

**87.**　McCarthey Aff. ¶ 66.

**88.**　*Id.* at ¶ 68.

motions concerning Judge Stewart's membership in the LDS Church. The Tenth Circuit emphatically held that "merely because Judge Stewart belongs to and contributes to the Mormon Church would never be enough to disqualify him." [89] This is true regardless of which side in the litigation believes that the religious affiliation of the judge makes him partial to one side or the other.

Finally, inasmuch as SLTPC joins the McCarthey Family's motion, these allegations are untimely in their case. The alleged comments of Mr. Singleton were printed in a *Tribune* editorial in July, 2002. They cannot be used as a basis for recusal by SLTPC nearly three years later.

### b. Judge Stewart's Statements in Earlier Proceedings

 The McCarthey Family next alleges that certain statements and rulings made by Judge Stewart reveal an "actual bias" against the McCarthey Family.[90] Two of these comments were made in connection with AT & T's motion for summary judgment on certain tortious interference claims raised by SLTPC. The gist of these claims was that AT & T (through its subsidiary Kearns–Tribune) intentionally interfered with SLTPC's rights under the Management Agreement and the Option Agreement by entering into a three-way transaction whereby it sold Kearns–Tribune to MediaNews knowing that MediaNews and DNPC intended to amend the JOA to undercut SLTPC's management rights and impede any attempt to exercise the Option Agreement. These same issues are echoed in the McCarthey Family's counterclaim.

In support of its motion for summary judgment, AT & T offered 19 short statements of undisputed facts. In response, SLTPC offered 290 paragraphs of facts and 178 supporting exhibits—many of which had to do with negotiations to sell *The Tribune* to DNPC.

At a hearing on January 29, 2002, SLTPC's attorney began discussing the facts surrounding DNPC. Judge Stewart stopped the attorney and said:

Let's not go into all that. The Court will make a finding right now that all of that, probably the first 200 statements of fact, are irrelevant or only marginal, and I don't want to go into that, Mr. Bendinger. Let's get on with those issues before the Court right now and that is the conduct of AT & T, not TCI, not some principal in TCI, though he may have been transferred over to AT & T.[91]

In his written opinion on the matter, Judge Stewart reiterated that "[e]vidence relating to the negotiations for the various proposed deals between the AT & T Defendants and Descret News Publishing is irrelevant to these claims because those various proposals never became final and the AT & T Defendants did not sell to Deseret News Publishing." [92]

Mr. McCarthey's affidavit alleges that Judge Stewart's ruling "summarily eliminated from the case the initial phase of the scheme to interfere with the Family Agreement and, with it, the issue of Governor Leavitt's knowledge of or participation in the scheme." [93] The ruling did no such thing. The issue of the "Family Agreement" was not even before Judge Stewart

---

**89.** *In re McCarthey,* 368 F.3d at 1270.

**90.** McCarthey Aff. ¶ 79.

**91.** Tr. January 29, 2002 hearing, Case No. 2:00–CV–00936ST at 31.

**92.** Order Granting AT & T Defendant's Motion to Dismiss or for Summary Judgment, Case No. 2:00–CV–00936ST (Mar. 27, 2002).

**93.** McCarthey Aff. ¶ 72.

at the time, and the McCarthey Family was not a party to the case. Judge Stewart simply ruled that for purposes of the motion then before him, certain facts were only marginally relevant. A judge's reactions to evidence do not constitute grounds for recusal. "The complaints of the [McCarthey Family] relate to actions and statement during the proceedings. They reflect the judge's attitude and reactions to incidents then occurring. They do not reflect any personal feeling for or against any party or any attorney." [94] And there is no indication that Judge Stewart's rulings were based on anything " 'other than what the judge learned from his participation in the case.' " [95] A judge's comments that a certain argument or certain facts are "irrelevant" may "indicate that the judge assessed certain ... arguments harshly [but] would not allow a reasonable person to harbor doubts that the judge considered those [arguments] impartially." [96]

The McCarthey Family also points to a statement by Judge Stewart during a hearing concerning SLTPC's motion to bifurcate its upcoming trial concerning the Option Agreement from any issues surrounding the McCarthey Family's independent claims. According to Mr. McCarthey's affidavit, "Judge Stewart asked SLTPC's counsel 'It's a little bit difficult for you to stand there and represent that the parties-the plaintiffs in the Colorado case [McCartheys] and your clients [SLTPC] are really different, isn't it?' When SLTPC's counsel responded that he 'didn't believe so or [he] wouldn't have

done it,' Judge Stewart responded 'You're going to stick by your *story*.' " [97] Mr. McCarthey asserts that Judge Stewart's statement classifies the McCarthey Family's claims as a "story" so that Judge Stewart "has unfairly prejudged the Family's claims before the Family has ever had its day in court on these issues." [98]

Once again, this court does not have to accept as true Mr. McCarthey's *conclusion* that Judge Stewart has prejudged the Family's claims. And accepting the *factual* allegations as true reveals nothing other than the fact that Judge Stewart was asking questions relevant to a pending motion on which he was required to rule. Indeed, it was Judge Stewart's job not merely to ask questions, but ultimately to come to a conclusion on the matter. "Bias" and "prejudice," according to the Supreme Court, "connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate* ...." [99] There is certainly nothing wrongful or inappropriate about a judge reaching a conclusion on a matter that has been placed before him by the litigants in the case.

Next, the McCarthey Family points to a ruling by Judge Stewart on May 8, 2002. According to Mr. McCarthey's affidavit, Judge Stewart ruled "that the McCarthey Family's claims should not be adjudicated in the SLTPC case because 'resolution of the McCarth[e]ys' claims will require the involvement of AT & T and AT & T Broadband, parties who have already obtained summary judgment in this case.' I am fearful that because Judge Stewart has

**94.** *Davis v. Cities Service Oil Co.*, 420 F.2d 1278, 1282 (10th Cir.1970).

**95.** *Id.* (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).

**96.** *United States v. Pearson*, 203 F.3d 1243, 1277–78 (10th Cir.2000), *cert. denied*, 530

U.S. 1268, 120 S.Ct. 2734, 147 L.Ed.2d 995 (2000).

**97.** McCarthey Aff. ¶ 75 (emphasis in original).

**98.** *Id.* at ¶ 76.

**99.** *Liteky*, 510 U.S. at 550, 114 S.Ct. 1147.

already ruled in favor of AT & T with respect to SLTPC's claims, Judge Stewart will be unfairly predisposed to rule the same way for AT & T with respect to the Family's substantive claims." [100]

These statements by Judge Stewart came in connection with his ruling under 28 U.S.C. § 1367(c) declining to exercise supplemental jurisdiction over certain claims. The finding regarding AT & T was one factor, in a list of many, for declining supplemental jurisdiction.

■■■■ Judge Stewart's perfectly reasonable ruling cannot be used as a basis for recusal. "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.... Almost invariably, they are proper grounds for appeal, not for recusal." [101] Judge Stewart's statements do not reveal any bias or prejudice of any kind. If his ruling was wrong, the proper remedy is an appeal. Nor can the fact that Judge Stewart ruled in favor of AT & T in the related case be used as evidence that he will be predisposed to do the same in the McCarthey Family's case. "[N]ot subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings." [102]

■■■■ This same conclusion applies to the final ruling of Judge Stewart raised by Mr. McCarthey's affidavit. In ruling on SLTPC's motion for a preliminary injunction preventing MediaNews, through Kearns–Tribune, from taking over management operations of *The Tribune* upon expiration of the Management Agreement, Judge Stewart stated:

In this regard, the court cannot ignore the fact that Plaintiff's owners were largely in charge of their own destiny. They chose to enter into the 1997 merger, to create their own company, to enter into a Management Agreement that could be terminated by notice, and to enter into agreements that result in a substantial gap between the Management Agreement and close of the Option. They did not have to, but did accept the transactions as structured by their attorneys for tax benefits.[103]

These statements are also part of a judicial ruling. They reveal no bias or prejudice, but merely a determination based on evidence before the court; they cannot form the basis for a bias or prejudice motion. The McCarthey Family worries that these statements reflect some predetermined view of their claims. The statements, however, reflect nothing more than a reason for denying a motion for preliminary injunction that was then before the judge.

■■■■ Judge Stewart has, of course, formed opinions over the course of these cases. It is his job to do so. Judges make rulings. Those rulings require judgments about the merits of the case. If a judgment is wrong, an appeal may be taken. But "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." [104] Judge Stewart's

100. McCarthey Aff. ¶ 77.

101. *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147.

102. *Id.* at 551, 114 S.Ct. 1147.

103. Order Denying Plaintiff's Motion for Preliminary Injunction, Ordering Notice of Certain Changes and Unsealing Pleadings and Exhibits, Case No. 2:00–CV–00936ST (July 22, 2002).

104. *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147 (emphasis added).

rulings reveal nothing more than his views on the merits of the issues before him.

Finally, once again, inasmuch as SLTPC joins in this portion of the McCarthey Family's motion, the motion is untimely as to them. These events all relate to rulings in 2002. SLTPC cannot rely on them three years later in requesting recusal.

### 6. Events Surrounding the McCarthey Family's Petition for a Writ of Mandamus Against Judge Stewart

As a final basis for recusal, Mr. McCarthey's affidavit relates the circumstances surrounding the Family's petition to the Tenth Circuit for a writ of mandamus ordering Judge Stewart to make further disclosures regarding his membership in the LDS Church and his service as Chief of Staff to Governor Leavitt. The affidavit notes that Judge Stewart "failed to make the disclosures" before the writ was filed and after the writ was denied "entered an order denying our request for disclosures."[105] Mr. McCarthey states that "[i]n light of the past history of this case, I believe that the Family's attempts to obtain additional disclosures from Judge Stewart by seeking an extraordinary writ make it even more difficult for Judge Stewart to impartially judge this case."[106]

As for Judge Stewart's alleged failure to make the requested disclosures, the court simply notes that Judge Stewart had made the disclosures. The Tenth Circuit specifically held that Judge Stewart's responsibility to make disclosures under § 455 "has been satisfied in this case . . . ."[107] And as for the suggestion that the repeated attempts to obtain disclosure have affected Judge Stewart's impartiality, there is sim-

ply no evidence that this is so. Mr. McCarthey's belief is not enough to satisfy § 144 or § 455(a). This court has previously stated that "[a]n attorney cannot create his own grounds for recusal."[108] Neither can a party to a case create a reason for recusal by claiming, essentially, that they have pestered a judge into impartiality by continued motions for recusal and requests for further disclosures. These motions "'may very well establish [the McCarthey's] feelings toward [the court]', but they have 'no tendency to show [the court's] feelings towards [the McCartheys]."[109]

### CONCLUSION

The court has carefully reviewed all of the claims so that any reasonable person interested in this matter would understand the relevant facts. Understanding the relevant facts, no reasonable person would have any doubts about Judge Stewart's ability to fairly decide the cases before him. Having thoroughly reviewed the motion, the accompanying affidavit and exhibits, and the arguments on all sides, the court concludes that there is no basis for recusal. The motion is therefore DENIED.

SO ORDERED.

---

105. McCarthey Aff. ¶ 82.

106. McCarthey Aff. ¶ 83.

107. *In re McCarthey*, 368 F.3d at 1269.

108. *Evans*, 262 F.Supp.2d at 1296.

109. *Id.* at 1295–96 (quoting *King v. United States*, 576 F.2d 432, 437 (2nd Cir.1978), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978)).